# THE ALFRED RICHARDS BRICK COMPANY

*v.*

## ROTHWELL.

### No. 1081.

---

## ROSS *v.* SAME.

### No. 1082.

---

## WEST *v.* SAME.

### No. 1083.

---

## GARTHE *v.* SAME.

### No. 1084.

---

CONTRACTS; SURETYSHIP; BONDS; EQUITY; GOVERNMENT CONTRACTORS; LIENS; PRIORITIES; FOLLOWING TRUST FUNDS; SUBROGATION; EQUITABLE ASSIGNMENTS; APPELLATE PRACTICE.

1. Sureties on bonds given by government contractors as required by the act of Congress of August 13, 1894 (28 Stat. 278), providing that every such contractor before commencing work shall give a

bond conditioned upon the payment of all persons supplying material and labor in the prosecution of the work, have a right in equity to interpose to prevent the diversion or misapplication of the contract price and to require it to be paid out to such materialmen and laborers in the first instance by virtue of the lien and preference given by operation of the statute; and this right of the sureties cannot be displaced or derogated from by any action on the part of the contractors looking to the protection of their general creditors.

2. A provision in a contract between a contractor and the District of Columbia, providing for the payment by the contractor of all claims for work and material and for the retention by the District commissioners, in their discretion, of a sufficient sum of money from the contract price to pay such claims, does not constitute the municipal corporation a trustee for materialmen and workmen, or give the latter any enforceable lien or preference over other creditors in the distribution of any portion of the contract price remaining in the hands of the commissioners.

3. Where receivers of insolvent government contractors assume and carry out contracts of such contractors for the building of schoolhouses for the municipal government and life-saving stations for the Federal government, and in so doing use funds derived from the schoolhouse contracts in the completion of the life-saving stations, persons supplying material and work in the erection of the schoolhouses are not entitled to follow such funds or to have preference over the claims of persons furnishing work and material in the erection of the life-saving stations.

4. It is only in cases where a person advancing money to pay the debt of another stands in the situation of a surety or is compelled to pay it to protect his own rights, that equity will substitute him in the place of the creditor as matter of course without any agreement to that effect; but in other cases the demand of a creditor which is paid with the money of a third person and without agreement that the security shall be assigned or kept on foot for the benefit of such third person, is absolutely extinguishable.

5. Where insolvent government contractors give a power of attorney to one of their creditors to perform their contracts and receive and disburse moneys received thereunder to their creditors, and such power of attorney contains no provision for the compensation of such attorney, and the affairs of the contractors are subsequently placed in the hands of receivers, of whom such attorney is one, he has no lien or preference for compensation for his services performed while acting as such attorney, in the subsequent distribution among creditors, but if entitled to compensation at all, is entitled to it only as a general creditor of the contractor.

6. Where government contractors induce a third person to indorse their

note in order to procure money to complete one of their several contracts under a promise to pay the note out of the money to be derived from such contract, the transaction will not constitute an equitable assignment so as to entitle the indorser to priority over other creditors of the contractors in a distribution by receivers of funds received by them upon the completion of all the contracts.

7. An appeal to this court will not be dismissed upon the ground that the appeal bond was approved by one of the justices of the lower court without notice having been first given to the appellee to show cause against the approval; rule X of this court not requiring that such a notice be given as a prerequisite to the approval of the bond by the lower court.

Submitted June 7, 1901. Decided October 3, 1901.

HEARING on several separate appeals taken from a decree of the Supreme Court of the District of Columbia, ratifying and confirming a report of the auditor of that court, distributing certain funds in regard to which there were conflicting claims for priority of allowance. *Reversed.*

The COURT in its opinion stated the case as follows:

The record before us presents four appeals, numbered, respectively, 1081, 1082, 1083, and 1084, as they stand upon the calendar of this court. These appeals are taken from the decree or final order of the court below, on February 1, 1901, ratifying and confirming the auditor's report and accounts filed in the cause October 19, 1900. The appeals are by separate claimants in respect to the action of the court below in affirming the auditor's report distributing the funds in controversy, in regard to which there are conflicting claims for priority of allowance.

The record presents considerable complication, if not confusion, in the proceedings. The original bill was filed by sureties in contractor's bond to secure the proper application of the fund arising under the contract to the discharge of claims for work and materials furnished in the construction of the buildings. An injunction and receivers were asked for. To this bill a cross-bill was filed by one of the firm of contractors, praying a dissolution of partnership and settlement of partnership affairs, and also asking for an

injunction and receivers. In this state of proceeding another surety of the same contractor, on a bond for the execution of a different contract, made application to intervene, and, upon obtaining leave, filed a bill, and prayed for similar relief to that prayed for in the original bill, and also prayed for an injunction and for receivers. Receivers were appointed, and they took charge of the funds that accrued under the several contracts that the contractors had entered into prior to filing the original bill.

The parties to the proceedings are very numerous, and as the questions presented by the appeals are questions of the right of priority of payment from the different funds brought into the case for distribution, the rights and relation of the parties to the funds and to each other will best appear by a clear statement of the allegations made in the several bills, and the contents of certain documents filed therewith. We shall, therefore, state with some fulness the allegations of the bills and answers, and the contents of the exhibits.

By the original bill, filed by Rothwell and Linger as sureties, Thomas R. Riley, Frank Baldwin, William C. Peake, and many other persons were made defendants. In that bill it was alleged that on June 15, 1897, the firm of Baldwin & Peake entered into a contract with the United States government for the construction of three life-saving stations, namely, at Dam Neck Mills, False Cape, and Caffey's Inlet, on the coast of North Carolina and Virginia, for the sum of $14,613, and simultaneously with the contract gave bond in the penalty of $15,000, with the complainants, Rothwell and Linger, as sureties therein, conditioned for the performance of the work according to the contract, and with the further condition that the contractors, Baldwin & Peake, would promptly make "payment to all persons supplying them with labor and materials in the prosecution of the work provided for in such contract." It is further alleged that the buildings were finally completed in the month of March, 1899, and that there was due on account thereof by the United States the sum of $8,088, but that there were outstanding and unpaid sundry claims against the contractors, and com-

plainants as sureties, for labor performed and materials furnished in and about the construction of said life-saving stations.

It is then alleged, that, for certain reasons stated, Baldwin & Peake, the contractors, on August 25, 1898, executed and delivered to Thomas R. Riley, one of the defendants, an instrument, in the form of a power of attorney, whereby they sought to appoint said Riley as their attorney to complete said life-saving stations, and to perform certain other contracts of said firm therein mentioned, and to authorize him to collect the money due or thereafter to become due on any of said contracts, and to apply the same " to the completion of said several contracts and to the liquidation of any indebtedness of the said firm " then existing or thereafter incurred in and about the execution of said contracts. This instrument or power of attorney contains this clause: After reciting the fact that the firm of Baldwin & Peake had entered into contracts with the United States government to build four life-saving stations, and which remained uncompleted; and also entered into contracts with the commissioners of the District of Columbia for the erection of three schoolhouses in the said District, and which said contracts with the District remained only partly performed — the instrument then proceeds to recite, " that whereas certain differences have arisen between the said Baldwin and the said Peake in regard to the management of the business of the firm, now, in order to obviate possible litigation between the said partners over said differences, and to facilitate the completion and execution of the contracts referred to, the said parties hereto of the first and second part have, and do hereby appoint Thomas R. Riley their true and lawful attorney to complete and carry out the several contracts above named, and for that purpose empower the said Riley to do all things that may be necessary and requisite, *in the name and behalf of the said firm,* to fully execute said contracts. And further, to collect any and all sums of money that may be now payable or that may become hereafter payable, from the United States government or from the District of Co-

lumbia, by reason of, or on account of, the said contracts; and from the said moneys so received, to pay any and all just indebtedness due and incurred in and about the execution of said contracts. It being distinctly understood that any money received on account of any of the said contracts referred to, *in the discretion* of the said Thomas R. Riley, shall be applied to the completion of the said several contracts and to the liquidation of any indebtedness of the said firm now existing or hereafter incurred in and about the execution of the said contracts, as the said Riley, in his best discretion, shall find to be to the best interests of all concerned. And further, that any money remaining in the hands of the said Riley, after completing all of the contracts herein referred to, and liquidation of all just debts connected therewith, shall be held by the said Riley to be paid to the said Baldwin & Peake, respectively, as their interests may be hereafter agreed upon or may be otherwise settled," etc.

This instrument was signed by Baldwin and Peake separately and individually, with separate seals; but it was not signed by Riley.

After referring to the instrument just quoted, the bill further alleges that it was the purpose and intent of the parties to such instrument that Riley should first pay out of any fund which he should receive from any particular work, the debts and obligations incurred in and about the construction thereof, before making distribution of any portion of the fund among the general creditors of the firm of Baldwin & Peake. That Riley, acting under said power of attorney, took charge of the prosecution of said work, and received from time to time large sums of money on account thereof. That the complainants were not parties to said agreement, were not consulted in relation thereto, and did not assent to the same; and, further, that the persons who furnished labor and materials for the completion of the said life-saving stations had no information of the existence of the said power of attorney.

The complainants then aver that in equity they were entitled to have first paid out of the fund resulting from the

completion of the life-saving stations all claims for labor and materials actually furnished, and performed in their construction and completion, for which the complainants were legally liable under their bond before any portion of the fund should be paid to the general creditors of Baldwin & Peake. And further, that the defendant Riley, in violation of the purposes and intent of the power of attorney, and contrary to its terms, was seeking to obtain from the treasury of the United States the balance due on said life-saving stations, with the avowed purpose of diverting the same from the payment of claims for labor and materials arising under the contract for the construction of the life-saving stations, and of applying the same towards the payment of the claims of certain creditors, among whom was Riley himself, accrued under other contracts. The bill upon these allegations prayed for an injunction, the appointment of receivers, the application of the fund to the payment of the claims for labor and materials furnished in the construction of the life-saving stations, and for general relief.

Upon this bill temporary receivers were appointed, and they made a report to the court as to the *status* and extent of the fund owing by the United States to the contractors.

In the answer of Riley, Lincoln, and Ross, defendants, to the rule to show cause against the appointment of receivers and the issuing of an injunction, reference was made to a meeting of creditors of the firm of Baldwin & Peake shortly after the making of the power of attorney referred to, and to an agreement that was made at that meeting, which was made an exhibit in the cause, and in which it is recited that the firm of Baldwin & Peake were contractors for the erection of three schoolhouses in the District of Columbia, and four life-saving stations on the coast of North Carolina; that said firm had been using indiscriminately the money received on account of some buildings upon the work of all, and being embarrassed, appointed the said Riley *their agent* to receive all moneys due or to become due on account of any of said buildings, and to employ so much thereof as was necessary to complete those which were still uncompleted,

and distribute the residue among the creditors of the firm who contributed labor and materials to complete the build-ings or any of them, and to pay over the surplus to Baldwin & Peake; and the agreement also recites that the provisions contained in the power of attorney to Riley *met with the approval of the creditors who signed the latter agreement.* All of the appellants now before the court (except appellant Garthe), were among those who signed the agreement, and thereby consented to the arrangement devised. By this agreement, the creditors signing the same, agreed to with-draw notices of claims theretofore filed by them with the commissioners of the District of Columbia against the firm of Baldwin & Peake, and consented that the District of Columbia and the United States should make payment of the money due on said contracts to said Riley, regardless of said notices, and they agreed not to file any further notices of claims thereafter.

At this meeting of the Washington creditors who signed the agreement just referred to, and who had claims against Baldwin & Peake for labor and materials furnished in the construction of the schoolhouses, for the purpose manifestly of securing to themselves any surplus or balance that might remain of the funds becoming due from the United States, after satisfying and discharging all claims for labor and materials furnished in the erection of the life-saving stations, they appointed S. D. Lincoln and Samuel Ross to act as a committee in conjunction with Riley to superintend the completion of the several works for which Baldwin & Peake had contracted, and to collect and disburse the money be-coming due under the several contracts, in accordance with the terms and arrangement agreed to by them. In the joint answer of Riley, Lincoln, and Ross, the committee, to the original bill, in answering the allegation that the complain-ants did not sign the agreement, and, not being parties thereto, they were not bound thereby, these defendants say, " they admit that the complainants were not parties to the execution of the power of attorney and the agreement between the creditors, and they were not consulted in connection

therewith; and they aver that it was not necessary that the complainants should either execute or be consulted about the execution of those instruments." The answer then proceeds to say: " These defendants say they are willing that all just claims for labor and materials actually furnished to said Baldwin & Peake in connection with the construction of the three life-saving stations should be paid, and they now tender themselves as ready and willing to pay all such just claims." They further allege and contend that the complainants have no concern with the disbursement of the fund received by Riley *after* all claims for labor and materials furnished in the construction of the three life-saving stations were paid. They further admit that the power of attorney to Riley could only operate to constitute the latter the mere agent of Baldwin & Peake for the purposes therein stated.

After this answer had been filed, Peake, one of the firm of Baldwin & Peake, and one of the defendants to the original bill, filed a cross-bill against Riley, Ross, and Lincoln, the committee representing the creditors who had signed the agreement to which we have referred, and against others, including all of the appellants in the present appeals, except appellant Garthe, in which cross-bill it is alleged that in equity the complainants in the original bill were entitled to have the fund derived from the building of the life-saving stations applied first to the payment for labor performed and materials supplied in the construction of the said stations, for which the said original complainants would be liable as sureties under their bond. This cross-bill sought dissolution of the partnership of Baldwin & Peake, and the settlement of partnership affairs, the distribution of assets, and the appointment of receivers. In this cross-bill were alleged certain facts in regard to the execution of the power of attorney to Riley, and the intention and purpose thereof, and that such purpose and intention had been and were being perverted by Riley; and the bill prayed for the reformation of said power of attorney and the construction thereof, in order to effectuate the intention and purpose alleged. This cross-bill was not answered by Riley, or the other members of the

creditor's committee, but testimony was taken in support of the allegations of the bill, and a final decree thereon was passed on the 26th of January, 1900, taking the bill *pro confesso.*

By the decree thus passed, the partnership was declared dissolved, and the proceedings were referred to the auditor to state the necessary accounts with a view to winding up the affairs of the firm. Riley was required to discover and render an account of all moneys and other property in his hands, and to discover and show in what manner he had applied the money that had come into his hands, so far as it had been applied. The decree then provided and declared: "That said power of attorney, dated the 26th day of August, 1898, be and the same is hereby construed so as to entitle the cross-complainant, Peake, to have first paid out of any funds received by the said defendant, Thomas R. Riley, from any particular structure or building all claims for labor and materials employed and expended in and about the completion thereof, before any of the funds so derived shall be applied to the payment of any of the general indebtedness of said firm; and in so far as it has been found that funds have been diverted by the said Thomas R. Riley from the payment of such labor and material claims aforesaid, it is hereby ordered, adjudged, and decreed that the said Riley be, and he is hereby held personally liable therefor and charged therewith, in his accounts before said auditor; and it is further ordered, adjudged, and decreed that defendants Samuel Ross and S. D. Lincoln acquired no right in or power under the said paper writing or power of attorney given by the said Baldwin & Peake to said defendant Riley."

There was no appeal taken from this decree, and it, therefore, stands unreversed and in full force. By this decree, the priority of right of the claimants for labor and materials furnished for the construction of the life-saving stations, was clearly adjudged.

It will be observed that by the order appointing the temporary receivers, they were directed to take charge of all of the affairs and business of the firm of Baldwin & Peake, and

to collect all money due and payable to that firm from any and all sources whatever. The order in its broad terms included the money for the building of the life-saving station at Hog Island as well as the other three stations; and that being so, the United States Fidelity and Guaranty Company, the surety on the bond of Baldwin & Peake to the United States for the construction of the station at Hog Island, applied for leave to intervene, and the leave being obtained, the company filed a bill alleging the facts, and prayed for the same relief as against the defendants in respect to the fund accruing from the Hog Island station as that sought by the original complainants in respect to the other three stations. The facts appear to be the same *mutatis mutandis.*

By this intervening bill, filed by the United States Fidelity and Guaranty Company, it was alleged that there were claims outstanding for labor and materials furnished and used in the construction of the Hog Island station; and that, unless the defendant Riley was restrained from diverting the fund paid on account thereof, he would apply it to the payment of claims, including a claim of his own, incurred in and about the construction of other buildings, to the prejudice of the creditors whose claims were incurred in the construction of said Hog Island life-saving station, and of the United States Fidelity and Guaranty Company, the surety on the bond of said contractors.

In the progress of the cause permanent receivers were appointed (one of whom being the said Thomas R. Riley), and they collected from the treasury of the United States the money due for the construction of all four life-saving stations, amounting, in the aggregate, to the sum of $17,030.42, as shown by schedules B and C filed by the auditor with his report. By schedule F it is shown that Riley, as agent, had received from the District of Columbia and disbursed the sum of $27,579.83, under the contracts for building the schoolhouses.

Upon the reference to the auditor a large volume of testimony was taken, and upon which he based certain findings,

and founded his report, and distribution of the funds in the hands of the receivers. Several exceptions were taken to the distribution of the funds as made by the auditor, but the exceptions were all overruled, and the auditor's report and schedules as returned were ratified in their entirety. It is from the order overruling the exceptions and ratifying the report of the auditor that these appeals are taken.

*Mr. W. C. Prentiss* and *Mr. H. Prescott Gatley,* for the appellants, The Alfred Richards Brick Company, Hugh Reilly, James Bennett, Samuel Ross, and West & Brother:

1. In the absence of statutory authority the officers of the government cannot assume guardianship of individuals and make contracts for them. *United States* v. *Pumphrey,* 11 App. D. C. 49; *United States* v. *Draper,* 19 D. C. 91 (93); *Brick Co.* v. *District of Columbia,* 1 App. D. C. 351. Again, the laborers and materialmen are mere strangers to any agreement made between the temporary receivers and the Secretary of the Treasury, and to the consideration and could not take advantage of it. *Corporation of Washington* v. *Young,* 10 Wheat. 406; *Brick Co.* v. *District of Columbia, supra; Breen* v. *Kelly,* 45 Minn. 352; *Sears* v. *Williams,* 9 Wash. 428; *Parker* v. *Jeffrey,* 26 Oreg. 186; *Anderson* v. *Fitzgerald,* 21 Fed. Rep. 294; *Willard* v. *Wood,* 135 U. S. 309; *Constable* v. *Steamship Co.,* 154 U. S. 51. Penalties or liquidated damages in these government contracts can be enforced only to the extent of actual damage suffered by the government. *Edgar and Thompson* v. *United States,* 34 Ct. Cl. 217. *United States ex rel.* v. *Windom,* 137 U. S. 636, is authority only to the point that a waiver coupled with such condition is only conditional, and delivery of warrant drawn in pursuance thereof cannot be enforced by mandamus. The laborer and materialman, of course, has no standing to enforce the condition.

2. The claim of the laborer or materialman, when enforced by the government, is, as shown above, enforced, not by authority or the right of the claimant, but by force and

coercion. There is no general doctrine of equity that supports the right of the laborer or materialman to preference out of the proceeds of the work to which his labor or material has contributed. *Fosdick* v. *Schall,* 99 U. S. 235. The act of 1894, to afford materialmen security, was passed for two reasons, first, because subcontractors theretofore had no lien or security (see report of committee printed in appellant's brief in *United States to use of Marble Co.* v. *Burgdorf,* 16 App. D. C. 140), and second, to relieve the government officers from the annoyance and trouble of giving attention to such claims. Proper application of the doctrine invoked by the auditor, if such doctrine were supportable, would extend the same preference to the schoolhouse creditors in respect to the fund from each schoolhouse, and require that the fund from each schoolhouse be determined, followed and restored for distribution. Neither the schoolhouse creditors nor the life-saving station creditors as shown before had any legal or equitable claim, title or lien to or upon the contract money in the hands of the District or the United States, or any power in themselves to control it in any way. *Brick Co.* v. *District of Columbia,* 1 App. D. C. 351. The District, however, was withholding payments by reason of unpaid claims brought to its attention. Thus the matter might have stood indefinitely, for so long as just claims remained unpaid there was lacking full performance on the part of the contractors. *Knapp* v. *Swaney,* 56 Mich. 345. Under these circumstances Baldwin & Peake, being unable to proceed, executed the agreement appointing Riley their attorney in fact to finish the work and receive all money for the equal benefit of the life-saving station and schoolhouse creditors. But the schoolhouse funds withheld by the District being the only money available for carrying on the work and the District authorities refusing to pay over the money so long as claims remained filed with them, counsel for Baldwin & Peake prepared the further paper which, by its terms, recited approval by all the creditors and contemplated the withdrawal of claims filed with the United States as well as those filed with the District. This paper was presented

to the schoolhouse creditors, and being signed and acted upon
by them afforded an actual consideration for the power of
attorney to Riley and the trust created therein.   Far from
being an arrangement whereby the creditors signing as-
sumed the character of builders and contractors, their sig-
natures were obtained upon the representation that the ar-
rangement was approved by the life-saving station creditors
and the whole effect of the action of the signing creditors
was to release a fund upon which they had no lien and to
which they had no legal or equitable claim.   *Brick Co.* v.
*District of Columbia,* 1 App. D. C. 351.   There is no founda-
tion whatever in the record and none in fact for the assump-
tion by the court below that the schoolhouse creditors went
into partnership with Baldwin & Peake or put themselves
in the place of that firm.   That the life-saving station credit-
ors had the statutory bond to resort to cannot give them any
right to preference.   It gave them merely the personal lia-
bility of the contractors and their sureties in exchange for
their material and labor, and gave them that security for
the very reason that they had no lien or claim upon the build-
ings or the contract price.   The sureties can have no higher
or greater equities in the application of the fund than the
claimants to whom they may be liable.   The extent of their
right is that they may stand in the shoes of the creditors
and *enforce for their exoneration any lien of the creditor
on the estate of the principal* and *may bring any suit in
equity which the creditor might bring for the settlement of
accounts and administration of assets,* the creditor being a
party in order that he may receive the money recovered.
Brandt on Suretyship, etc., Sec. 192, p. 273.   But in no
case can the surety be entitled to any greater relief than is
the creditor.   A bill to enforce payment of money except
by way of enforcement of a lien or trust cannot be main-
tained.   *Lamon* v. *McKee,* 18 D. C. 446.   As the life-saving
station creditors had no lien the application of the sureties
here must be either to enforce the trust created in the power
of attorney to Riley or to secure the payment of the dividend
due the life-saving station claimants as general creditors, and

34

in either case there could be no preference. The sureties are not in a position to entitle them to claim such relief.

3. During the progress of the suit Peake, by a cross-bill, sought to have the power of attorney to Riley reformed to conform to a draft of such a paper filed as an exhibit to that cross-bill, and procured a decree, not reforming the instrument, but attempting to construe it for his benefit. This decree did not bind the creditors who had signed the creditors' agreement based upon the power of attorney to Riley as executed, they not being parties to the cross-bill; but even that decree goes no further than to declare the meaning of the power of attorney to be that indebtedness incurred by Riley in the *completion* of the work shall be first paid. Furthermore, this decree was entered without notice, after the reference to the auditor, under which the appellants' rights in the suit accrued. But even had the decree upon this cross-bill been binding and adverse, the question is before this court on appeal. The ground of Peake's prayer for reformation of the power of attorney is apparently *mistake*, but there is no allegation that the mistake was mutual or that there was any misunderstanding upon the part of any one but himself, and he claims relief merely because he signed the paper without reading it. There is, therefore, no foundation for a decree reforming the instrument or construing it otherwise than its language demands. The power of attorney to Riley is valid. Being for the benefit of creditors and covering the whole fund it is not within the prohibition of R. S. 3477 and 3737. *Goodman* v. *Niblack,* 102 U. S. 559. It was given for an actual consideration, the agreement upon the part of the creditors. It, therefore, created a valid trust in favor of the creditors mentioned in it. As an equitable, or even legal, assignment it was perfected by notice to the District and the Treasury Department. The power of attorney to Riley, and the agreement signed by the creditors must be read together. Each contemplates and creates one general class of beneficiaries, the schoolhouse and life-saving station creditors, to share equally in the proceeds after the cost of completing all the

work is first paid. Such equal distribution is demanded by the principles of equity and preferences could be created only by clear and unequivocal language. And even then any such attempted preference would seem to be void as in violation of section 2 of the act of February 24, 1893, 24 Stat. 474. But even were any preference to be allowed claims upon a particular building to be paid out of the proceeds of that particular work, it would still be necessary to follow and restore the schoolhouse money and identify a fund from each of the five buildings, for distribution among the claimants thereon.

4. Witthaft's claim to preference is based wholly upon the testimony of Peake in support of his cross-bill and before the auditor in behalf of Witthaft to the effect that he procured Witthaft's indorsement of notes to be discounted at the National Capital Bank upon the understanding that as soon as he got the money from the life-saving stations he would pay the notes, the two notes afterwards being renewed in one; and upon Peake's testimony that after Riley's appointment he called the latter's attention to this note and Riley made some vague promises. A mere promise to pay a debt out of a particular fund will not operate to give the creditor a lien upon that fund. 1 Jones on Liens, Sec. 48, 52; 13 Ency. Law (1st ed.), 609, cases note 1; 2 Ency. Law (2d ed.), 1068, cases note 3. This doctrine is firmly settled by the Supreme Court of the United States. *Dillon* v. *Barnard,* 21 Wall. 430; *Burke, exr. Trist,* v. *Child,* 21 Wall. 441; *Christmas* v. *Russell,* 14 Wall. 70. And has been established by our Court in General Term. *Wood* v. *Dickinson,* 18 D. C. 301. See also *Dexter* v. *Gordon,* 11 App. D. C. 60.

5. The power of attorney to Riley for the benefit of the creditors was a *bona fide* assignment for value, and Riley and the creditors are in the position of junior assignees without notice; and Riley having expended the schoolhouse money upon the faith of such assignment and been recognized by the Secretary of the Treasury (who directed checks to be delivered to him), they take precedence of Witthaft,

even had the latter had an assignment which could be recognized otherwise. *Spain* v. *Brent,* 1 Wall. 604; *Spain* v. *Hamilton,* 1 Wall. 623; *Judson* v. *Corcoran,* 17 How. 612; *Laclede Bank* v. *Schuler,* 120 U. S. 511; *Bank* v. *Trust Co., supra.* The necessity of restoration of the schoolhouse fund would also apply to Witthaft's claim. But a final and complete answer to Witthaft is that such an assignment as he claims is absolutely void under sections 3477 and 3737,. R. S. *Goodman* v. *Niblack,* 102 U. S. 559; *Burke, exr. Trist, v. Child,* 21 Wall. 441; *Spofford* v. *Kirk,* 97 U. S. 484. *Conde* v. *York,* 168 U. S. 642, was dismissed in the Supreme Court for want of jurisdiction without passing on this question. If anything it supports the Riley assignment as against Witthaft's claim.

6. Riley is not entitled to compensation. He accepted the trust with the distinct understanding that he was to act without compensation. Peake so testifies, and Riley, testifying before the auditor, can only say that he can't recollect that there was such an agreement, but admits that the subject was mentioned. The auditor and the court below seem to have overlooked Peake's testimony. His services were voluntary. He was one of the largest creditors and his services were for his own benefit. *First Nat. Bank* v. *Owen,* 23 Iowa, 185. There is no agreement for compensation in the power of attorney, and that instrument disposes of the whole fund, evidencing the intention and understanding that no compensation should be received. The action of the court below in removing Riley as trustee or custodian of the fund and appointing receivers, could only have been based upon misconduct or intended breach of trust, and in such case a trustee forfeits any right to compensation. 27 Ency. Law, 187. If entitled to compensation at all, Riley is not entitled to preference. Having disbursed all the money received by him he had no fund in his hands upon which he could have a lien. In such case he has only a claim against Baldwin & Peake and could come in only as a general creditor. Perry on Trusts, Sec. 609.

*Mr. James Francis Smith,* for the appellant William
·Garthe.

*Mr. Clarence A. Brandenburg,* for the appellees the
United States Fidelity and Guaranty Company and John N.
.Hart.

*Mr. John Goode,* for the appellee Jonathan Woodhouse.

*Mr. D. W. Baker,* for the appellees H. B. Davis & Co., and
·the Southern Oil and Supply Company.

*Mr. George H. Lamar,* for the appellees Louisa H. Bride
.and Frederick J. Miller, executrix and executor of William
Witthaft, deceased, and Alexander E. Warner and Edward
B. Hughes.

*Mr. Sidney T. Thomas,* for the appellee Thomas R. Riley.

1. Riley was practically the receiver of Baldwin & .Peake.
The situation of Mr. Riley under the power of attorney
from Baldwin & Peake was like that of a receiver. He took
up the unfinished life-saving stations and completed them
to the satisfaction of the Treasury Department. He com-
pleted the school buildings to the satisfaction of the com-
missioners of the District. He collected and disbursed
$29,120.20, in the execution of his trust. Had he been ap-
pointed receiver instead of the attorney of Baldwin & Peake
the court would have allowed him 10 per cent. for his services.
The court below allowed the receivers 10 per cent., and they
were appointed when the work was finished and there was
nothing to do but collect the balance of moneys due Baldwin
& Peake.

2. Professor Newmark, in his article on "Receivers" in
the Am. & En. Ency. of Law, Vol. 20, page 168, speaking
·of the compensation of receivers, says: "A receiver, unless
it is otherwise ordered, as where he consented to act without

a salary, will be allowed a salary, or have some other allowance made to him for his care and pains in the execution of his duties, and the right of a receiver to compensation is not impaired by the fact that the actual work of managing the property intrusted to him is performed by others." See also Beach on Receivers, 822.

3. The auditor's findings are conclusive. The court below referred the amount of Mr. Riley's compensation to the auditor. There was no error in this, and the finding should not be disturbed except for some manifest error. *Richardson* v. *Van Auken,* 5 App. D. C. 209; *Grafton* v. *Paine,* 7 App. D. C. 255. The compensation to be allowed a receiver is a matter of sound judicial discretion in the court below. *Cake* v. *Mohun,* 164 U. S. 311. In *Cake* v. *Mohun, supra,* the auditor allowed Mohun, as receiver of the Hotel Normandie, 10 per cent. on collections, 5 per cent. on disbursements, and a counsel fee of $500; and this in a case where the receiver was "not prevented from giving his usual attention to his private business, and ordinarily spent only his evenings at the hotel." In this case the auditor finds that Mr. Riley not only raised money to assist in carrying on the work, but "gave to the subject-matter of his agency a substantial portion of his time and service until the appointment of the temporary receivers."

4. Mr. Riley's services were not voluntary. There is absolutely no foundation for the contention that Mr. Riley gave his services voluntarily. He was asked if he did, and he testified that he did not, and there was no evidence to the contrary. So far as Mr. Riley's compensation is concerned there is no error in the record, and the decree of the court below should be affirmed.

*Mr. George Francis Williams* and *Mr. Charles F. Benjamin,* for the appellee Richard Rothwell.

*Mr. Andrew Y. Bradley,* for the appellee the John L. Roper Lumber Company.

Mr. Chief Justice Alvey delivered the opinion of the Court:

Though the testimony taken was quite voluminous, a very small part of it is contained in the record before us. We have only a few extracts from the testimony of the many witnesses that were examined, but such parts as have been incorporated are supposed to be sufficient to enable us to pass upon the questions raised by the exceptions. It is manifest, however, that we cannot review the auditor's findings, so far as they depend upon conclusions deducible from the evidence produced before him, and not contained in the record before us. We can, however, seeing the general nature and character of the claims, and the relation of the several parties to the funds for distribution, determine and declare the principles that must control in making distribution of the funds in controversy.

1. Of the several questions presented, the first and most leading of them is that which relates to the claims of the parties who furnished labor and materials in the construction of the life-saving stations, and, consequently, the rights of the sureties on the bonds given the government to secure the faithful performance of the contracts by the contractors for the work. This question is dependent upon the terms of the act of Congress of August 13, 1894 (28 Stat. 278), and the bonds of the contractors taken in pursuance thereof.

By the act of Congress just referred to, it is provided that all persons entering into any formal contract with the United States for the construction of any public building, or the prosecution and completion of any public work, or for repairs thereof, " shall be required before commencing such work to execute the usual penal bond, with good and sufficient sureties, with the additional obligations that such contractor or contractors shall promptly make payments to all persons supplying him or them labor and materials in the prosecution of the work provided for in such contract; " and the statute further provides, that any person so furnishing labor and materials, and having an unpaid claim therefor, shall, upon application, as the statute directs, be furnished

with copies of such contract and bond, and have a right to sue and recover thereon, in the name of the United States, for his or their use, against such contractor and sureties. The bonds of the contractors in this case, given for the faithful execution of the work on the life-saving stations, contain the condition prescribed by the statute. And the question is, what is the effect of the provision of the statute and the condition of the bonds executed as the statute requires, in respect to claims for labor and materials?

There is no mechanic's lien law that applies to or that can be enforced against buildings erected for the government. But the statute just recited makes provision that is intended practically to serve the same beneficent purpose of a mechanic's lien law. It creates no lien, it is true, against the building erected, but it makes provision for securing the payment of the contractors of all claims for labor and materials furnished in the erection of the buildings, or, in default of payment by the contractors, that the bond and sureties thereon shall be liable to such claimants. As was said by the Circuit Court of Appeals of the United States, in the case of *United States, to the use of Foundry Company* v. *National Surety Company,* 92 Fed. Rep. 549, " The bond which is provided for by the act, was intended to perform a double function; in the first place to secure the government for the faithful performance of all obligations which the contractor might assume towards it, and, in the second place, to protect third persons from whom the contractor obtains materials and labor. Viewed in its latter aspect, the bond, by virtue of the operation of the statute, contains an agreement between the obligors therein and such third parties, that they shall be paid for whatever labor and materials they may supply, and enable the principal in the bond to execute his contract with the United States. The two agreements which the bond contains, one for the benefit of the government, and the one for the benefit of third persons, are as distinct as if they were contained in separate instruments.  *  *  *   The act bears every evidence that it was intended to provide a security for laborers and material-

men on which they could rely confidently for protection, unless they see fit by their own dealings with the contractor, to relinquish the benefit of the security." There is, therefore, by necessary implication, an equitable lien and preference secured in favor of the parties who furnish labor and materials in the execution of the contract, in the application or distribution of the contract price remaining to be paid; and where the government, as in the present instance, holds in its hands any part of the money contracted to be paid for the work, and there remain unpaid claims for labor and materials supplied, it holds such fund as *quasi* trustee for the benefit of those entitled to receive it under the condition in the bond; that is to say, the laborers and materialmen remaining unpaid. This right to preference being the result of the operation of the statute and the condition of the bond, it is the clear right, upon the plainest principles of justice, of the sureties in the bond to invoke a court of equity to enforce the preference and equitable lien for their protection. In construing this act of Congress of 13th August, 1894, this court said, in the case of *Marble Company* v. *Burgdorf*, 13 App. D. C. 506, 519: " The practical effect of the statute is to confer a special lien in favor of such persons (parties furnishing labor and materials) and to substitute the bond, in the place of the public building, as the thing upon which that lien is charged." That is to say, the bond is liable rather than the building upon which labor and materials are used in construction; and if the sureties should pay claims for such labor and materials for which they may be responsible on the bond, they have a right, upon well-settled principles, of substitution to such claims as against the contract price of the work remaining due to the contractor. And having such right of substitution, the sureties have a right to interpose to prevent the diversion or misapplication of the fund, and to require it to be paid out to the parties entitled to receive it in the first instance by virtue of the lien and preference given by operation of the statute."

The principle we have stated seems to have been applied by the auditor in the distribution of the funds arising from

the life-saving stations, though, as it appears, with a departure in some particulars. The rights of the claimants for labor and materials, and the consequent rights of the sureties on the bonds of the contractors being fixed, those rights could not be displaced or derogated from by the power of attorney to Riley, or the subsequent agreement by creditors, to which the claimants for labor and materials supplied to the life-saving stations were not parties, either in favor of Riley himself, or other creditors than those signing the agreement, or those represented by those who did sign it. The power of attorney to Riley was wholly inoperative as against such creditors of Baldwin & Peake.

2. The creditors of the firm of Baldwin & Peake, who furnished labor and materials for the construction of the schoolhouses erected in the District of Columbia, stand on quite a different footing from those furnishing labor and materials for the life-saving stations. The funds arising under the contracts for the schoolhouses were paid over to Riley, who received them under the power of attorney made to him, and the agreement made between the schoolhouse creditors. As in the case of contracts for the erection of buildings for the United States, there is no mechanic's lien law that can be enforced against the public buildings erected for the municipal government of the District, and there is no such statutory provision applicable to building contracts made by the District government as that contained in the act of Congress of August 13, 1894. The contracts for the building of the schoolhouses in the District contain the following clause:

" Contractors will pay the workmen who shall be employed by them upon the work under their contract punctually, in cash current, and not in what is denominated store or pay orders, and will, from time to time, and as often as may be required by the commissioners, furnish satisfactory evidence that all persons who have done work or furnished materials have been paid as herein required; and if such evidence is not furnished, such sum or sums as may be necessary for such payments may, *in the discretion* of the com-

missioners, be retained until such claims shall be fully satisfied."

This provision of the contract, however, does not create an enforceable lien or preference in the distribution of the fund remaining in the hands of the commissioners in favor of the parties furnishing labor and materials for the building. It only invests the commissioners with power *to be exercised in their discretion,* to require the contractors to discharge unpaid claims for work and materials furnished, by withholding the amount of such claims until they were satisfied by the contractors. The provision of the contract was manifestly intended to avoid trouble and delay in the prosecution of the work, and the possible attachment by workmen and materialmen, and, at the same time, to require justice to be done to the claimants by the contractors. But no lien was given for such claims. As said by this court, in the case of *Brick Co. v. District of Columbia,* 1 App. D. C. 351, in construing a similar clause of the contract in that case: " There is nothing in this clause of the contract that constitutes the municipal corporation a trustee for those who might deal with and trust the contractors with the municipality." In other words, there was no lien or preference thereby created.

3. It is claimed by the appellants in these appeals that a considerable amount of money paid on account of the contracts for the erection of the school buildings in Washington city, and to which they would have been entitled, was wrongfully applied and expended in the construction of the life-saving stations, and especially that at Hog Island; and that, by reason of that fact, they are entitled to reimbursement from the funds arising from the construction of the life-saving stations, to the extent of such expenditures, particularly the station at Hog Island; and that, consequently, there should be a curtailment of the funds received on the contracts for those stations, to the extent of the expenditures so made, and the amount thereof added to the funds received on the contracts for the school buildings. But manifestly this contention cannot be maintained upon any principle of law or equity.

In the first place, the money that was paid on the contracts for the building the schoolhouses in Washington city, whether to Baldwin & Peake directly, or to Riley, their agent, was paid in performance of the contracts as the money became due thereon, and the money so paid at once became the money of Baldwin & Peake, the contractors, and they could apply it as they deemed proper.

Moreover, all the present appellants, except William Garthe, were active in procuring the money due for the erection of the District schoolhouses to be paid over to Riley, the agent of the contractors; and whatever portion of that money, if any, that may have been applied in the construction of the Hog Island life-saving station, or any of the other stations, the evidence wholly fails to show, and this was the finding of the auditor. There is no evidence in the record to trace and identify the money, if any, derived from the schoolhouse contracts, that was applied to the construction of either or any of the life-saving stations; and this of itself would be a sufficient answer to the contention of the appellants.

There seems to be some confusion as to the grounds upon which the appellants claim to derive benefit from the funds derived from the contracts for the life-saving stations. In the exceptions taken to the auditor's report, among the many specifications of alleged error, it is alleged " that the funds from said four stations were created entirely, or nearly so, by funds received from the schoolhouses in Washington city by Riley, as attorney and trustee, and used by him in completing the said stations, and, therefore, the schoolhouse funds must be followed and restored. That the schoolhouse creditors are entitled to subrogation to the rights of those who received schoolhouse money from Riley, for labor and materials, contributed towards completing the four life-saving stations, and, in any event, must have a *first lien* on the funds from those stations."

As we have said, the fact here alleged is denied, and there is no evidence of its existence. But if it were true that any part of the money received on the contracts for the building of the schoolhouses had been applied, either by the con-

tractors themselves, or by their agent Riley, in the completion of the life-saving stations, the principle of substitution or subrogation could have no application to such case. There is no foundation whatever shown for the application of such doctrine. As held by all the authorities, it is only in cases where the person advancing the money to pay the debt of a third party stands in the situation of a surety, or is compelled to pay it to protect his own rights, that a court of equity will substitute him in the place of the creditor, as matter of course, without any agreement to that effect. But, in other cases, the demand of a creditor, which is paid with the money of a third person, and without any agreement that the security shall be assigned or kept on foot for the benefit of such third person, is absolutely extinguished. *Sanford* v. *McLean*, 3 Paige, 116. The doctrine is very fully and clearly expounded in the opinion of Mr. Justice Miller of the Supreme Court, in the case of *Ætna Life Ins. Co.* v. *Middleport*, 124 U. S. 534, 550. In the present case, the money that was paid over by the government to the receivers was paid as the money of the contractors, earned and due according to the terms of the contracts, and not as money to which third parties were entitled by way of substitution for money voluntarily advanced for the completion of the contracts. There is no place, therefore, for the application of the doctrine of substitution, even if it were shown that money paid on the schoolhouse contracts had been applied to the contractors, or their agent, in the completion of the life-saving stations. The most that the exceptants and appellants could claim, with any apparent reason, is, that all the funds, derived under the several contracts, as well those for the construction of the life-saving stations as those for the construction of the schoolhouses, should be distributed as a whole and *pari passu* among all the creditors of Baldwin & Peake. But this, as we have shown, cannot be done.

4. Another exception taken to the auditor's report is to the preferential allowance of commission to Riley out of the funds received and disbursed by him,— and to be paid out of funds in the hands of the receivers — the commission

amounting to the sum of $2,334.72,— as compensation for services rendered under the power of attorney. In the exception, it is objected that no compensation should have been allowed to Riley to be paid out of the funds in the hands of the receivers, other than regular commissions to him as one of the permanent receivers. As reasons for this exception, it is alleged in the exception filed, that Riley had no fund in his hands upon which he could have a lien at the time the original bill was filed; that he was not entitled to any lien for compensation; that he had no equitable or legal right to preference, if entitled to any compensation at all, as attorney in fact; that if he had any claim for such compensation it was only as general creditor of Baldwin & Peake; but that the evidence shows that he was entitled to no compensation whatever, as such attorney for Baldwin & Peake.

This allowance to Riley as commission for services under the power of attorney, in addition to the commission allowed him as one of the permanent receivers, is given the same preference as is given to the allowance of costs and expenses of the litigation and to the commissions allowed to the receivers appointed by the court. In this, we think, there was manifest error. It is very clear that Baldwin & Peake had no power to affect or displace the liens of the claimants for labor and materials furnished for the construction of the life-saving stations; and it is equally certain that the power of attorney created no lien or preference for commission superior to the claims of those who furnished labor and materials for the construction of the school buildings in the city of Washington. The attorney, Riley, simply stood in the place of and represented the contractors in what he did under the power held by him; and he acquired no superior rights to compensation to any other employee of the contractors. The power of attorney contains no provision for commission or compensation to the agent appointed thereby; and Riley does not testify himself that there was any definite agreement that he was to receive compensation, and Peake is explicit in testifying that it was understood and agreed that he was not to receive compensation; but that his services were

to be rendered in the interest of the creditors,— he, Riley, being one of the most considerable in amount. On the meagre evidence contained in the record we will not determine that he is not entitled to any compensation at all; but we do hold and ·determine that if compensation be allowed, it can only be as a general creditor of Baldwin & Peake. All the money that he received and disbursed was received on account of the contracts for the building of the schoolhouses, according to the auditor's report, and no part of it from the life-saving stations.

5. Another preferential allowance made by the auditor, and distributed to in schedules B and C from the funds arising from the life-saving station contracts, is the claim of William Witthaft for money paid as indorser of notes made by Peake and discounted in bank, the proceeds of which are claimed to have been applied in the construction of the life-saving stations. The preference given to this claim over the general creditors is founded upon the testimony of Peake, one of the contractors. In his testimony, given upon two occasions, in relating the circumstances under which the notes were made and indorsed, and how the matter was subsequently treated, he says: "This was the renewal of two notes we had gotten discounted at the National Capital Bank. We needed money very badly in the prosecution of the work on the life-saving stations, and on two different occasions I got him (Witthaft) to indorse notes for me, and when they came due we had not the money and the two notes were merged into one, with the understanding that when I got the money from the life-saving stations he was to be paid." That at the time the original note was indorsed by Witthaft, "one station was completed, and another was very nearly completed, and another one about half completed;" and at that time about $8,000 or $10,000 had been paid to the subcontractors on the work. That these facts were all explained to Mr. Witthaft before his indorsements were obtained. I told him that just as soon as we got the money from the life-saving stations we would take up this note; I told him that frequently; I told him so before his indorsement of the note.

I also told the president of the bank that we had a great deal
of money coming from the life-saving stations, out of which
I would certainly pay off this note. The money was expended
on the life-saving stations; it was all sent down there to be
paid by the foreman." On further examination he says:
" I explained how far we were advanced with the work, how
soon I expected it to be done, and when I expected the money,
and made him (Witthaft) a positive promise to give him the
money out of the money received. I did not promise to
pay it out of the first money that I should get from any
source; but out of this particular fund derived from the life-
saving stations."

The auditor and the court below in allowing preference to
this claim over the claims of the general creditors of the firm
of Baldwin & Peake, appear to have acted upon the prin-
ciple that, according to the testimony of Peake, there was an
equitable assignment of so much of the fund that might
thereafter become due and be received on the contracts for
the construction of the life-saving stations as would be suffi-
cient to pay off the notes indorsed by Witthaft. If such a
contract of assignment was in a proper legal sense made, it
could only be, of course, in subordination to the lien and
preference secured to parties furnishing labor and materials
to the construction of the life-saving stations. But, we think,
there was clear error in supposing that any such equitable
assignment was shown to exist. The funds were not really
in existence at the time when the notes were made and in-
dorsed, and when they subsequently came into existence they
were subject to the superior claims for labor and materials
supplied, and those claims might exhaust the entire funds.
The promise relied on did not profess to give the promisee
control of the fund, or any particular part of it; it was only
a personal promise that some part of the funds, when re-
ceived, should be applied to the taking up the notes. As
said by the Supreme Court, in the case of *Christmas* v. *Rus-
sell,* 14 Wall. 69, 84: "An agreement to pay out of a par-
ticular fund, however clear in its terms, is not an equitable
assignment; a covenant in the most solemn form has no

greater effect. The phraseology employed is not material, provided the intent to transfer is manifested. Such an intent and its execution are indispensable. The assignor must not retain any control over the fund — any authority to collect, or any power of revocation. If he do, it is fatal to the claim of the assignee. The transfer must be of such a character that the fundholder can safely pay, and is compellable to do so, though forbidden by the assignor. Where the transfer is of the character described, the fundholder is bound from the time of notice." It is upon this principle that a bill of exchange or check is not an equitable assignment *pro tanto* of the funds of the drawer in the hands of the drawee. The same principle has been enunciated and applied by this court, in the case of *Bank* v. *Trust Company,* 17 App. D. C. 112. See also the cases of *Dillon* v. *Barnard,* 21 Wall. 430, 439, and *Trist* v. *Child,* 21 Wall. 441.

6. There are other claims made subject to the general exceptions to the auditor's report, and which are involved in these appeals. The claim of John N. Hart is one of these, which was allowed a preference over general creditors and distributed to in schedule C. The claim is against the fund arising from the contract for the construction of the Hog Island life-saving station, and which appears to have been allowed by stipulation and under an order of court from which there was no appeal taken. We can perceive no available objection to the preference given to this claim in the distribution of the fund distributed in schedule C. It was clearly properly allowed.

The claim of I. Woodhouse for materials furnished to the life-saving stations at Caffey's Inlet, False Cape, and Dam Neck, allowed as a preferred claim and distributed to in schedule B, would seem to be subject to no valid objection. We think the claim was properly allowed.

It follows from what we have said that the order of the court below overruling all the exceptions to the auditor's report, distributing the several funds, must be reversed, and the cause be remanded for a restatement of accounts in accordance with the foregoing opinion.

There were motions filed to dismiss two of the appeals, numbers 1082 and 1083, upon several grounds. But it being afterwards discovered that there was error as to the matter of fact upon which the motions were founded, the motions were abandoned, except as to the one ground for the motion, founded upon the allegation that the appeal bonds were approved by one of the justices of the Supreme Court of the District without notice having been first given to the appellees to show cause against the approval. But, we think, this ground is not sufficient for the dismissal of the appeal. We cannot say that the approval of the bond without such notice is a nullity; at most it would be but an irregularity. This court is required, by the act of Congress, of July 30, 1894, to make rules "to regulate all matters relating to appeals, whether in the court below or in said Court of Appeals." The subject is regulated by rule X of this court, and by that rule such notice is not required to be given as a prerequisite to the approval of the bond by the justice below. While such notice may be proper in particular cases, in the discretion of the justice called upon to approve the bond, it is not a condition precedent, the non-observance of which will nullify the bond. The matter cannot be controlled to the extent of nullifying the bond after approval, because of the non-compliance with a rule of the court below, requiring notice to be given to the appellees to show cause against the approval of the bond proposed for approval.

The motions to dismiss must, therefore, be *overruled.*

Order appealed from *reversed, and cause remanded for further proceedings, in accordance with the foregoing opinion.*